IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

MARGARET LAMB and )
EILEEN M. BUSER, on behalf of )
themselves and all others similarly )
situated, )
)
    Plaintiffs, )
)
vs. )   Case No.: _____
)
)   **JURY TRIAL DEMANDED**
GRACO CHILDREN'S )
PRODUCTS, INC. and )
NEWELL RUBBERMAID, INC., )
)
    Defendants. )

## COMPLAINT

### Parties

1.    Defendant GRACO CHILDREN'S PRODUCTS INC. ("GRACO") was, at all relevant times, a foreign corporation organized and existing according to the laws of Delaware with its principal place of business in Pennsylvania. GRACO is and has been engaged in the business of designing, manufacturing, distributing, marketing, and selling products in the state of Florida, including the "TurboBooster" child safety seat. GRACO regularly did business in Florida, and its products, including the child safety seats involved in this case (the "TurboBooster"), are regularly sold and used by consumers in Florida. GRACO

has, therefore, submitted itself to the jurisdiction of this Court.

2. Plaintiff, MARGARET LAMB, is a resident of Leon County, Florida. Plaintiff, MARGARET LAMB purchased a TurboBooster, model 8491RGB, serial number JJ1120032240227, with a manufacturing date of 11/20/2003. Plaintiff did not buy this seat directly from the Defendants.

3. Plaintiff, EILEEN M. BUSER, is a resident of Jefferson County, Florida. Plaintiff, EILEEN M. BUSER purchased a TurboBooster, model 8491QNY, serial number JJ1225062749927, with a manufacturing date of 12/25/2006. Plaintiff did not buy this seat directly from the Defendants.

4. Plaintiff, MARGARET LAMB and Plaintiff, EILEEN M. BUSER will be referred to collectively in this Complaint as "Plaintiffs."

5. GRACO is a "brand" of Defendant, NEWELL RUBBERMAID, INC. ("NEWELL RUBBERMAID"). At various times relevant to the matters alleged in this Complaint, GRACO was also known as a "division," "brand" and "subsidiary" of NEWELL RUBBERMAID. NEWELL RUBBERMAID was, at all relevant times, a corporation organized and existing according to the laws of the state of Delaware. At all relevant times, NEWELL RUBBERMAID has conducted business in the state of Florida. NEWELL RUBBERMAID is and has been engaged in the business of designing, manufacturing, distributing, marketing and selling products in the state of Florida, including the "TurboBooster" child safety

seat. NEWELL RUBBERMAID is subject to the jurisdiction of this Court.

6. At all relevant times, NEWELL RUBBERMAID supplied the capital and approvals necessary to design, manufacture, market and sell the TurboBooster. At all times, NEWELL RUBBERMAID exercised complete dominion and control over GRACO with respect to the TurboBooster, whether GRACO is deemed a "brand," "subsidiary," or "division."

7. NEWELL RUBBERMAID employed in-house legal, compliance and regulatory personnel to make decisions regarding the TurboBooster, and these employees, on behalf of NEWELL RUBBERMAID, ultimately made or ratified the decisions that allowed the TurboBooster to be sold in a defective condition as more fully set forth below.

8. NEWELL RUBBERMAID is also responsible for all representations and warranties made by GRACO.

9. NEWELL RUBBERMAID and GRACO will be referred to collectively in this Complaint as "Defendants."

## Jurisdiction and Venue

10. The Court has subject matter jurisdiction under 28 U.S.C. § 1332, which provides for federal jurisdiction in class actions with minimal diversity when damages exceed five million dollars, exclusive of interest and costs. The

Court has supplemental subject matter jurisdiction over the pendent state law claims, pursuant to 28 U.S.C. § 1367.

11. Plaintiffs reside in this district, and Plaintiffs purchased their TurboBoosters while residing in the district. Venue is thus appropriate within the contemplation of 28 U.S.C. § 1391.

### Factual Background

12. The TurboBooster is a belt-positioning child restraint device subject to 49 C.F.R. §571.213, also known as Federal Motor Vehicle Safety Standard 213 ("FMVSS 213").

13. FMVSS 213 is "a minimum standard for . . . motor vehicle equipment performance." 49 U.S.C. §30102.

14. At all relevant times, FMVSS 213 required that Defendants "self-certify" the TurboBooster as being in compliance with the standard before they sold or introduced any TurboBooster into the stream of commerce.

15. Every TurboBooster ever sold by Defendants expressly warrants and represents on the safety seat itself and in a permanent label, the following: "This child restraint system conforms to all applicable Federal Motor Vehicle Safety Standards."

16. Every TurboBooster ever sold by Defendants expressly warrants and represents, on the box that it is sold in, that the TurboBooster meets or exceeds the

4

requirements of FMVSS 213.

17.   At all relevant times, FMVSS 213 required that the TurboBooster comply with the following:

> S5.1.1. *Child restraint system integrity.* When tested in accordance with S6.1, each child restraint system shall meet the requirements of paragraphs (a) through (c) of this section.
>
> (a) Exhibit no complete separation of any load bearing structural element . . . .
>
> (b)(1)   If adjustable to different positions, remain in the same adjustment position during the testing that it was in immediately before the testing . . . .

18.   The TurboBooster is a "belt-positioning booster." It is not equipped with integrated harnesses or buckles but, instead, "positions" a child (raises the child off the automobile seat) so that the child can utilize the lap/shoulder seat belts in the vehicle.

19.   The TurboBooster is designed to be used in vehicle seating positions that are equipped with a lap/shoulder safety belt. When a child is using the TurboBooster, the lap belt is routed across the child's lap and rests on two lap belt guides on the TurboBooster. The shoulder belt is routed down and across the child's chest and under the TurboBooster armrest that is adjacent to the seat belt buckle (where it joins the lap belt and is then buckled).

20.   Every TurboBooster ever sold by Defendants has adjustable armrests. The armrests have two intended positions: "up" and "down."

5

21. In an FMVSS 213 sled test (a frontal collision), crash loads are initially transmitted into the shoulder belt by the child dummy. Once the slack in the belt is absorbed, the shoulder belt loads the armrest that is closest to the seat belt buckle.

22. The armrests are structural load-bearing elements of the TurboBooster.

23. Defendants have known or should have known, no later than 2002 (the first year of production), that the armrests of the TurboBooster were load-bearing structural elements of the seat.

24. Prior to the commencement of production of the TurboBooster, Defendants knew, or certainly could and should have known, that the National Highway Transportation Safety Administration ("NHTSA") and its test contractors had determined that the armrests on belt-positioning boosters were "load-bearing structural elements."

25. Because the armrests on the TurboBooster are adjustable, they are not permitted to change position during a sled test. A design that allows the armrest to change position during a sled test as alleged above is a violation of FMVSS 213, S5.1.1(b).

26. Any TurboBooster that contains a design that allows the armrest to change position during a sled test does not "conform" with FMVSS 213.

27. TurboBoosters are designed in a manner that allows the armrest on the TurboBooster to separate completely from the base. A design that allows the armrest to separate from the base during a sled test is a violation of FMVSS 213, S5.1.1(a).

28. Any TurboBooster that contains a design that allows the armrest to completely separate from the base during a sled test does not "conform" with FMVSS 213.

29. From the commencement of production in June 2002 through late 2007 or early 2008, Defendants sold millions of TurboBooster safety seats to consumers in the United States. All of these TurboBoosters shared common design defects that allowed the armrests to change position and/or completely separate from the seat's base. The principal design defect that allowed the armrests of the TurboBooster to change position and separate under crash forces is a plastic screw "boss" that was too thin, short and weak for the retention screw to "bite" into.

30. Defendants' implementation of a design and manufacturing change to the TurboBooster in approximately 2007 or 2008 resolved the lack of compliance with the child restraint system integrity requirements contained in FMVSS 213 and eliminated the safety related defect in the seats.

31. Defendants knew or should have known at all times that, prior to the design and manufacturing change of the plastic screw "boss," that the TurboBooster was not compliant in multiple respects with FMVSS 213 and that it contained a safety related defect.

32. Defendants knew at all times that the pre-2008 design of the TurboBooster presented a safety hazard to the users of the TurboBooster safety seats and that the sale of the TurboBooster to Plaintiffs and the public constituted the sale of a damaged product that could not perform as warranted.

33. At all relevant times, 49 U.S.C. § 30018(c)(1) required that Defendants notify owners of the TurboBoosters once it knew, or should have known, in good faith, that the safety seat contained a defect that related to motor vehicle safety. A change of position of the adjustable armrest during a sled test, or a complete separation of the armrest during a sled test, is a safety related defect.

34. Despite their knowledge as alleged herein, Defendants knowingly and deliberately concealed all information relating to the armrest failures from consumers and continue to conceal this information to this day. Defendants concealed this information so that they could continue producing and selling the TurboBooster without losing market share to their competitors (none of whom utilized adjustable armrests in their belt-positioning boosters) and so they could avoid the financial costs and loss of brand reputation that would be associated with

a recall or other public notification. More specifically, Defendants concealed, among other things, the following:

    a.    That after its first round of sled tests, GRACO managers knew that the armrest issue was a "problem" that required a "design fix."

    b.    That because of the armrest "problem," it began production of the TurboBooster in June 2002 "at risk."

    c.    That after going into production "at risk," the armrests continued to fail in sled testing, including failures in tests denominated by GRACO as "compliance" tests.

    d.    That fixing the armrest "problem" was assigned the lowest priority at GRACO.

    e.    That by 2005, after numerous sled test failures, GRACO engineers finally changed the design of the screw boss (making it wider and longer, but not thicker), so that the "load bearing capability" of the armrest would be improved and so that the "distribution of the load is better."

    f.    In October 2005, a lawsuit was filed against GRACO in federal court in Oklahoma after a child was ejected from a TurboBooster and killed when his armrest detached. In the case, GRACO's Rule 30(b)(6) witness, a senior compliance engineer, testified that GRACO had experienced only two (2) armrest failures in sled testing. The testimony was false. The number of complete armrest separations as of the date of this deposition (2/23/07) was actually fourteen (14). The number of times the armrest changed position but did not completely separate was at least five (5). The NHTSA would later send GRACO a request for information about the TurboBooster and the death of the child; all of these sled test failures were affirmatively concealed by GRACO.

    g.    On July 24, 2006, after another armrest separation in a sled test, GRACO's senior compliance engineer documented that the

9

    failures "could be a technical non-compliance" with FMVSS 213 and that production should not go forward "until this is resolved." This same engineer would later document that he "didn't want to argue the point" with NHTSA; as a result, information regarding the "technical non-compliance" was not, and has never been, disclosed to NHTSA.

 h. In April 2007, GRACO decided to thicken the screw boss in accordance with the recommendations made by its compliance engineer eight months earlier.

 i. In May 2007, the armrest separation problem on the seats was categorized internally at GRACO as a "compliance" issue.

 j. In August 2007, the first seats with the "fix" began to be sold. However, on information and belief, GRACO did not stop production to implement the fix on all of its armrest molds at once; rather, the molds were taken out of production so that the "fix" could be made only when demand slacked off enough to allow a slight decrease in production.

35. Every TurboBooster sold prior to the implementation of the August 2007 design change was sold with the representation that the seats "conform to," "meet" or "exceed" all applicable FMVSS 213 requirements.

36. Defendants knew or should have known, however, that these seats did not comply. Specifically, and among other things, Defendants deliberately, actively and successfully concealed everything they knew about the TurboBooster armrest failures from the public.

37. Defendants entered into a protective order in *McCune, et al. v. Graco Children's Products, Inc.*, et al., Civil Action No. 509-CV-107, pending in the U.S. District Court for the Eastern District of Texas, which prevents the disclosure of

TurboBooster discovery to this Court. In the event Defendants challenge the sufficiency of the Complaint pursuant to the Federal Rules of Civil Procedure, Plaintiff requests that this Court first modify the *McCune* protective order so that Plaintiff may amend this pleading to include information obtained in *McCune*.

### Class Action Allegations

38. Under Fed. R. Civ. P. 23, Plaintiffs bring this action on behalf of herself and the plaintiff class, initially defined as:

> All Florida residents who purchased a Graco TurboBooster manufactured prior to the implementation of the current TurboBooster design.

39. Excluded from the Plaintiff class are:

   a. Defendants and any entity in which Defendants have a controlling interest, and its legal representatives, employees, officers, directors, assigns and successors;

   b. The judge, magistrate and any special master to whom this case is assigned, and any member of their immediate families; and

   c. To the extent the class certification order permits exclusion, all persons who timely submit proper requests for exclusion from the Plaintiff class.

40. The Plaintiff class consists of all Florida residents who purchased a Graco TurboBooster manufactured prior to the implementation of the current design, thus making individual joinder impracticable pursuant to Rule 23(a)(1),

Fed. R. Civ. P. The disposition of the claims in a single class action will provide substantial benefits to all parties and to the Court.

41. The factual and legal bases of the claims are common to all Plaintiff class members and represent a common injury, Rule 23(a)(2), Fed. R. Civ. P.

42. There are many common questions of law and fact. These common issues include, but are not limited to, the following:

   a. Whether Defendants conceived, designed and manufactured a TurboBooster that did not meet the structural integrity requirements of FMVSS 213;

   b. Whether Defendants conceived, designed and manufactured a TurboBooster that contained a safety related defect;

   c. Whether Defendants implemented a uniform fix for the defect;

   d. Whether Defendants violated Fla. Stat. § 672.313; and

   e. Whether Defendants' conduct constituted fraudulent concealment.

These common questions of law and fact predominate over individual questions.

43. Plaintiffs will fairly and adequately represent and protect the interests of the plaintiff class, as required by Rule 23(a)(4), Fed. R. Civ. P. The named Plaintiffs identified in this complaint purchased the Graco TurboBooster prior to the availability of the modified TurboBooster with a design fix and are thus typical of the class, Rule 23(a)(3), Fed. R. Civ. P. Plaintiffs and their counsel are

committed to vigorously prosecuting this action on behalf of the plaintiff class and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interests adverse to those of the class.

## Breach of Express Warranties by Affirmation, Promise, Description, Sample Fla. Stat. § 672.313

44. Plaintiffs repeat and re-allege each and every allegation of this Complaint as if fully set forth herein verbatim.

45. At all times, Defendants are and have been engaged in the business of designing, manufacturing, distributing, marketing and selling the TurboBooster child safety seat throughout the United States, including the state of Florida.

46. At all times, Defendants are and have been merchants and sellers of the TurboBooster child safety seat, and Defendants sold the TurboBooster child safety seat to the consumer Plaintiffs and the members of the class.

47. Every TurboBooster seat ever sold by Defendants, including all TurboBooster seats sold to the Plaintiffs and the members of the class, expressly affirms, promises, warrants and represents on the safety seat itself and on a permanent label, the following: "This child restraint system conforms to all applicable Federal Motor Vehicle Safety Standards."

48. Every TurboBooster seat ever sold by the Defendants, including all TurboBooster seats sold to the Plaintiffs and the members of the class, expressly affirms, promises, warrants and represents on the box in which it is sold, that the

TurboBooster seats "conform to," "meet," or "exceed" all applicable FMVSS 213 requirements.

49. Defendants expressly warranted to the Plaintiffs and the members of the class that all of the TurboBooster child safety seats were merchantable and fit for their ordinary, particular and intended use and purpose as a child safety restraint.

50. However, the TurboBooster seats sold by Defendants to the Plaintiffs and the members of the class do not conform to all applicable Federal Motor Vehicle Safety Standards.

51. The TurboBooster child safety seats sold by the Defendants to the Plaintiffs fail to conform to FMVSS 213 because, as alleged more fully herein, the seats all share common design defects that allow the armrests to change position and/or completely separate from the seat's base. This design defect was not remedied until Defendants implemented a design change in approximately late 2007 or 2008.

52. The TurboBooster seats sold by Defendants to the Plaintiffs and the members of the class are not merchantable and fit for their ordinary, particular and intended use and purpose as a child safety restraint. These seats contain a safety related defect.

53. Defendants breached their express warranties to the Plaintiffs and the members of the class that the TurboBooster seats were merchantable at the time of delivery, thus depriving Plaintiffs of the product they bargained for - - a seat that conformed as warranted to FMVSS 213.

54. Defendants breached their express warranties to the Plaintiffs and members of the class that the TurboBooster seats were fit for their ordinary, particular and intended use and purpose as a child safety restraint at the time of delivery.

55. Defendants breached their express warranties to the Plaintiffs and the members of the class that the TurboBooster seats conformed to all Federal Motor Vehicle Safety Standards at the time of delivery.

56. Defendants have breached their express warranties to the Plaintiffs and the members of the class that the TurboBooster seats conformed to, met or exceeded all applicable FMVSS 213 requirements.

57. As a direct and proximate result of Defendants' breaches, the Plaintiffs and the members of the class have suffered monetary loss.

### Fraudulent Concealment

58. Plaintiffs repeat and re-allege each and every allegation of this Complaint as if fully set forth herein verbatim.

59. At all times, Defendants possessed superior knowledge of the TurboBooster child safety seat and its failures and defects.

60. At all times, Plaintiffs and the members of the class, without any fault or lack of diligence on their own part, were unaware and ignorant of the true character, nature and quality of the TurboBooster child safety seat. Plaintiffs were also unaware and ignorant of, without any fault or lack of diligence on their own part, of the defects and failures of the TurboBooster child safety seat.

61. Defendants had a duty, and have a continuing duty, to disclose material facts relating to the TurboBooster child safety seats to the Plaintiffs and members of the class, and Defendants failed to do so.

62. As previously mentioned herein, the armrests of the TurboBooster seat are structural load-bearing elements of the TurboBooster.

63. Defendants should have known, since before the TurboBooster was first produced in 2002, that the armrests of the TurboBooster were load-bearing structural elements of the seat.

64. From commencement of production in June 2002 through late 2007 or early 2008, Defendants sold millions of TurboBooster safety seats to consumers in the United States, including the Plaintiffs and members of the class. All of theses TurboBoosters sold to Plaintiffs and the members of the class shared design

defects that allowed the armrests to change position and/or completely separate from the seat's base.

65. Defendants knew that the TurboBooster seats were defective.

66. Defendants knew at all times that the armrest failures in the TurboBooster child safety seats were not in compliance, in multiple respects, with Federal Motor Vehicle Safety Standards.

67. Defendants knew at all times that the armrest failures in the TurboBooster presented a safety hazard to the users of the TurboBooster safety seats.

68. Every TurboBooster sold prior to the implementation of the design change, as alleged herein, was sold with the express affirmation, promise, warranty and representation that the TurboBooster child safety seats "conform to," "meet," or "exceed" all applicable FMVSS 213 requirements.

69. However, Defendants knew that the TurboBooster seats did not comply. Defendants engaged in a pattern of fraud, deception and concealment intended to keep the TurboBooster's lack of compliance with FMVSS 213 a secret. Plaintiffs will provide the specifics of such fraud, deception and concealment following modification of the *McCune* protective order.

70. Defendants have deliberately, actively and successfully concealed everything they know about the TurboBooster armrest defects and failures from the public.

71. Because of Defendants' fraudulent concealment of the material facts, as alleged herein, Defendants are estopped from relying on any statute of limitations defense because of their concealment of the true character, quality and nature of the TurboBooster child safety seat.

72. The applicable statutes of limitation to the causes of action alleged herein are, therefore, tolled by virtue of Defendants' knowing, willful and active concealment of all facts alleged herein.

73. The Plaintiffs and the members of the class were ignorant of this information, which was and is essential to the pursuit of the claims alleged herein, without any fault or lack of diligence on their own part.

74. Defendants' fraudulent concealment is common to the Plaintiffs and the members of the class.

75. As a direct and proximate result of Defendants' fraudulent concealment, the Plaintiffs and the members of the class have suffered monetary loss.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray that the Court enter judgment against Defendants and in favor of the Plaintiffs and the class and to award the following relief:

a. Certification of the proposed class under Rule 23, Fed. R. Civ. P.;

b. Appointment of Plaintiffs Lamb and Buser as Class Representatives;

c. Appointment of the undersigned attorneys as class counsel;

d. Finding that the Defendants' conduct constitutes a breach of express warranty;

e. Finding that Defendants' conduct constitutes fraudulent concealment;

f. An award of compensatory damages and attorneys' fees; and

g. Such other and further judiciary determinations and relief as may be appropriate in this proceeding.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Dated this 20th day of Sept. 2011

Respectfully Submitted,
GARVIN & MILLES
/s/ William H. Garvin
William H. Garvin III, Esq.
Fla Bar No. 601462
1582 Village Square Boulevard
Tallahassee, FL 32309
T: (850) 422-3400
F: (850) 906-9878
ATTORNEYS FOR PLAINTIFFS